UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CR-20423-RNS

UNITED STATES OF AMERICA

vs.

NEPMAR JESUS ESCALONA,

      Defendant.

_____

**GOVERNMENT'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

      The United States of America, by and through its undersigned attorneys, opposes the defendant's motion to suppress filed on March 20, 2023. Dkt. 38. The motion should be denied because the defendant has failed to meet the Eleventh Circuit's clear standard for suppression. The defendant's statements to law enforcement all took place prior to his arrest, were voluntary, and were not made during a custodial interrogation or its functional equivalent. Moreover, the defendant has failed to provide any evidence to the contrary. The defendant's motion to suppress his statements to law enforcement should be denied.

**Procedural Background**

      On August 26, 2022, the defendant was charged by criminal complaint with a single count of conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h). Dkt. 3. The defendant was arrested on August 26, 2023. Dkt. 6. On September 7, 2022, the defendant was indicted by the grand jury with a single count of conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h). Dkt. 10. The defendant was arraigned on the indictment before United States Magistrate

1

Judge Lisette M. Reid on September 19, 2022. Dkt. 14. Trial is scheduled for May 8, 2023.[1]

**Summary of Defendant's Statements and Admissions**

The defendant made admissions to law enforcement in the form of oral and written statements to federal agents prior to his arrest. The admissions occurred during voluntary interviews on January 31, February 1, February 2, February 16, and March 19, 2018.[2] The government holds that all relevant statements made by the defendant prior to his arrest, including these five interviews, are admissible at trial because the interviews were voluntary, and the defendant was not in custody at the time the statements were made. United States v. Luna-Encinas, 603 F.3d 876, 886 (11th Cir. 2010) (Defendant is entitled to Miranda warnings only if he was in custody at the time he made the statements in question); United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir.2004) (Miranda protection attaches only "when custodial interrogation begins.")

As summarized in the law enforcement reports, a Drug Enforcement Administration ("DEA") Special Agent and a DEA Task Force Officer ("the agents") approached the defendant in the driveway of his home in Aventura, Florida, at approximately 10:30 a.m. on January 31, 2018. The agents identified themselves as federal law enforcement agents and showed the defendant their badges and credentials; they did not brandish weapons or touch the defendant. While the defendant stood between the agents and the front door to his home, the agents asked to speak with him about his business. The defendant agreed and invited the agents into his backyard to sit on patio furniture for a conversation. The defendant's wife appeared at a back door and offered the agents something to drink, which they did not accept. The defendant's wife remained

---

[1] For recitation of the full procedural history, see Dkt. 45.
[2] The Government produced official law enforcement reports of the interviews on September 16, 2022. See Dkt. 23

inside the house and did not participate in the meeting between the agents and the defendant. The agents began the conversation by advising the defendant that their conversation was voluntary, and the defendant could end it at any time for any reason. The agents explained they were investigating an illegal scheme in which exporters to Venezuela were fraudulently being paid for imports to Venezuela that did not actually take place. The defendant told the agents that he conducted business dealings in Venezuela from South Florida, including the fraudulent importation of goods. The defendant explained that some of the goods were chemicals used for processing food and were secretly diluted. The invoices said the chemicals were 90 percent pure, but they were actually five percent pure. After approximately twenty minutes of discussion, the agents and defendant agreed to pause and meet again at the DEA Miami Field Division headquarters on the following day to discuss the defendant's illegal business practices in further detail.

     As agreed by the defendant, the defendant voluntarily appeared at the headquarters of the DEA Miami Field Division on February 1, 2018. The interview took place in a brightly lit conference room with floor to ceiling windows. The agents began the interview by again advising the defendant that their meeting was voluntary and that the defendant could leave at any time. Over the course of approximately two hours, the defendant told the agents, among other things, of his career with the Venezuelan National Guard. The defendant recounted meeting members of the charged criminal conspiracy and going into illegal business with them. The defendant told the agents that he placed proceeds of his business dealings in Venezuela in a Swiss bank account held in the name of his wife. The defendant told the agents that during the charged conspiracy period, he and his associates profited from importing machinery and food products to Venezuela that were diluted or entirely fake. The defendant agreed to speak with the

3

agents again the following day to further discuss details of his corrupt business practices, as well as the possibility of cooperating with the government's investigation.

The next day, February 2, 2018, the defendant voluntarily appeared at the United States Attorney's Office in Miami for an interview. Federal prosecutors attended, and the interview was conducted in a conference room. The AUSA told the defendant at the outset that the interview was voluntary, and the defendant could leave at any time. They also advised that he was free to consult or bring an attorney to the interview, but the defendant stated he preferred not to consult an attorney or have an attorney present. Over the course of approximately ninety minutes, the defendant further explained his fraudulent Venezuelan import business revolved around acquiring Venezuelan permits to release U.S. dollars outside of Venezuela. He named his co-conspirators and confirmed the receipt of proceeds into the United States through bank accounts held in the name of several businesses involved in the conspiracy. At the conclusion of the interview, the defendant agreed to meet with the agents again at a mutually agreed upon later date to continue assisting in the government's investigation by discussing his fraudulent import scheme in further detail.

After agreeing by telephone on a mutually convenient time and date, the defendant voluntarily returned to DEA Miami Field Division headquarters on February 16, 2018, and met with the agents in the same conference room. For approximately two hours, the defendant explained in greater detail that bribery of public officials in Venezuela was a key component of his import business. He stated that through associates in the customs directorate and the National Guard, bribes were distributed to facilitate the acquisition of documentation needed for his business. He explained that the rate of the bribe payments depended on the amount of goods being invoiced. He stated the products imported under this scheme were diluted or entirely fake

4

and that the bribe payments were higher for the entirely fake imports. The defendant explained that the customs workers had an extra inventory and would move product from warehouse to warehouse to simulate goods entering Venezuela. The defendant stated he would provide DEA the precise names of bribed public officials at a later date. The parties agreed to meet again to discuss the bribery in greater detail.

After agreeing by telephone on a mutually convenient time and date, the defendant voluntarily appeared at the DEA Miami Field Division headquarters on March 19, 2018, and met with the agents in the same conference room as prior interviews. During the meeting, the defendant gave the agents the name, rank, and location of twelve public officials in Venezuela that he had bribed with the help of co-conspirators. To assist the agents with understanding his illegal scheme, the defendant also handed the agents two thumb drives with documents regarding his conspiracy in Venezuela and the United States. The agents asked if was willing to proactively gather information on more illegal activity and he agreed. The agents stated to the defendant that he would still face charges for his past illegal conduct even if gathered information on others. The defendant agreed and continued to meet with the agents at least once every three months for approximately the next two years to discuss evidence of crime he had gathered or was attempting to gather.

**Legal Standard For Suppression Of Defendant Statements**

The Fifth Amendment to the United States Constitution states that "[n]o person...shall be compelled in any criminal case to be a witness against himself." Applying the Fifth Amendment to police interactions with criminal suspects, the Supreme Court held in <u>Miranda v. Arizona</u> that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). It then defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id.

The Eleventh Circuit has affirmed that Miranda protections only apply to custodial interrogations. Luna-Encinas, 603 F.3d at 886 (Defendant "entitled to Miranda warnings only if he was in custody at the time he made the statements in question); Acosta, 363 F.3d at 1148 (Miranda protection attaches only "when custodial interrogation begins"). To determine whether someone is in police custody, the Court must ask "whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave. The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006). Factors to be considered, "include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. Howes v. Fields, 565 U.S. 499, 509 (2012). Although not dispositive, "courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (emphasis in original), citing United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006). Other relevant factors include "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled." United States v. Barry, 479 F. App'x 297, 299 (11th Cir. 2012).

The Eleventh Circuit has also been deliberate in distinguishing a custodial interrogation from the "traditional investigatory functions" of police which lack the compulsive atmosphere that would trigger Miranda. Sullivan v. State of Alabama, 666 F.2d 478, 482 (11th Cir.1982). Police questioning someone after seizing that person with an "unusual degree of force" could be considered the functional equivalent of interrogation and an infringement of Miranda protections. United States v. Glen–Archila, 677 F.2d 809, 815 (11th Cir.1982). However, without other factors, "'on-the-scene questioning' concerning the facts and circumstances surrounding a crime or other general questioning of citizens during the fact-finding process do not trigger Miranda warnings." Garcia v. Singletary, 13 F.3d 1487, 1489 (11th Cir.1994).

**Legal Argument**

In his motion to suppress, the defendant denies that he, "made statements to government agents and prosecutors allegedly admitting wrongdoing." Dkt. 38, p 2. In particular, he denies making a statement to DEA agents "on March 19, 2018, during which the defendant detailed bribe payments to twelve specific public officials in Venezuela in furtherance of the illegal conspiracy." Id. Such denials are facts for the jury to consider at trial and not appropriately credited or discredited in a motion to suppress.

The defendant's motion also states, "[t]he alleged actions by government agents and prosecutors in this case violated due process rights under the Fifth Amendment," but fails to specify what "actions" are being referred to in the motion. Id. at 3. Presumably the defendant is attacking the viability of using his admissions as evidence at trial due to a lack of Miranda warning. In support, the defendant asserts that he, "did not knowingly, willingly, or voluntarily waive any constitutionally protected rights." Id.

7

However, no rights of the defendant were violated by the agents during their series of five voluntary interviews with him. The defendant was never in custody for questioning and was therefore never entitled to Miranda warnings. Luna-Encinas, 603 F.3d at 886; Acosta, 363 F.3d at 1148. None of the factors recognized by the Supreme Court or Eleventh Circuit caselaw as indicia of a custodial interrogation, or its functional equivalent, were met by the five interactions between DEA agents and the defendant. The agents showed zero force or coercion with the defendant. They never brandished weapons, used restraints, or even touched the defendant. They repeatedly told him he did not have to speak with them and that he was free to change his mind and leave even after the interviews had started.[3] In fact, the defendant did leave after each interview. The first interview was held in the comfort and familiarity of the defendant's backyard at his private home. The next four interviews were conducted at government buildings at mutually agreed upon appointment times, with the defendant traveling on his own accord and expense to and from the interviews. The frequency of the interviews, along with the professional manner in which they were conducted, are a strong indication that the interviews were voluntary and non-custodial in nature. Nothing in the defendant's motion suggests otherwise. Moreover, the Government supplied law enforcement reports that detailed all statements made by the defendant to law enforcement, therefore, there is no ambiguity as to the admissions.

**Conclusion**

For the foregoing reasons, suppression of the defendant's statements to law enforcement is inappropriate and the defendant's motion should be denied.

---

[3] "[A]bundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a multi-factor balancing test... That a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he was free to terminate the interview." United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004).

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   /s/ Andrea Goldbarg
ANDREA GOLDBARG
Assistant United States Attorney
Court ID No. A5502556
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9421
Email: agoldbarg@usdoj.gov

And   BRENT S. WIBLE
CHIEF
MONEY LAUNDERING AND ASSET
RECOVERY SECTION

By:   /s/ Joseph Palazzo
JOSEPH PALAZZO
Trial Attorney
Court ID No. A5502141
Money Laundering and Asset Recovery Section
U.S. Department of Justice, Criminal Division
1400 New York Avenue, N.W. – 10th Floor
Washington, D.C. 20005
Tel: (202) 514-1263
Email: joseph.palazzo@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** this third day of April, 2023, that I am filing this document electronically via CM/ECF, which will cause a true and correct copy to be delivered via email to all defense counsel of record.

/s/ Joseph Palazzo
JOSEPH PALAZZO