```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2
                      CASE NO. 22-CR-20423-RNS-1
3
     UNITED STATES OF AMERICA,
4                                        Miami, Florida
                  Plaintiff(s),
5                                        April 11, 2023
           vs.
6
     NEPMAR JESUS ESCALONA,
7
                  Defendant(s).      Pages 1 - 52
8    ------------------------------------------------------------
9                          MOTION HEARING
            TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10          BEFORE THE HONORABLE JONATHAN GOODMAN
               UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     FOR THE PLAINTIFF(S):   ANDREA GOLDBARG, ESQ.
13                           UNITED STATES ATTORNEY'S OFFICE
                             99 NE 4th Street
14                           Miami, FL 33132
                             (305) 961-9309
15                           andrea.goldbarg@usdoj.gov
16
     FOR THE DEFENDANT(S):   MANUEL J. RETURETA, ESQ.
17                           RETURETA & WASSEM, PLLC
                             300 New Jersey Avenue
18                           Washington, D.C. 20001
                             (202) 450-6119
19                           mjr@returetawassem.com
20
21   TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                             Court Reporter
22                           jemancari@gmail.com
23
24
25
```

1   Thereupon,

2   the following proceedings were held via Zoom videoconference:

3          THE DEPUTY CLERK:  Calling case USA v. Escalona, case

4   No. 22 20423, criminal, Scola.

5          THE COURT:  Good afternoon, folks.  Please be seated.

6          MS. GOLDBARG:  Good afternoon, your Honor.

7          THE COURT:  Make yourself comfortable.

8          Let's first make sure that the defendant can hear and

9   understand what I'm saying through the help of the headphones

10  and the interpreter.

11         Sir, are you able to hear and understand what I'm

12  saying?

13         THE DEFENDANT:  Yes, perfectly well.

14         THE COURT:  All right.  Thank you.

15         So let's have appearances, starting with the United

16  States, please.

17         MS. GOLDBARG:  Good afternoon, your Honor.  Andrea

18  Goldbarg on behalf of the United States.

19         THE COURT:  Thank you.

20         For the defense.

21         MR. RETURETA:  And good afternoon, your Honor.  Manuel

22  Retureta on behalf of Mr. Escalona.

23         THE COURT:  Good afternoon to you.

24         I understand from the docket sheet you're from

25  Washington, D.C.?

1    MR. RETURETA:  I'm from Washington, D.C.  I was moved

2    in *pro hac vice* by Mr. Nayib Hassan, who is currently in

3    Washington, D.C.

4         (Inaudible) extricate himself from a very long trial

5    that was supposed to finish in February, and he is still there.

6         THE COURT:  Well, welcome.

7         MR. RETURETA:  Thank you.

8         THE COURT:  The microphone is movable so you can pull

9    it closer to you and you can also move the wand.

10        Have the cherry trees started blossoming in

11   Washington, D.C. yet?

12        MR. RETURETA:  Your Honor, they were early, about two

13   to three weeks early.  They have now lost their blooms.

14        THE COURT:  Is there the kind of philosophy there,

15   similar to Pennsylvania, where if the groundhog generates a

16   shadow it means that winter is going to be longer or shorter?

17   Is there something like that with the cherry trees in

18   Washington?

19        MR. RETURETA:  It usually ends up that if they bloom

20   early that means we are going to have to deal with a lot of

21   tourists for about a few extra weeks than normal.

22        THE COURT:  I guess that's a mixed blessing.

23        MR. RETURETA:  Indeed, your Honor.

24        THE COURT:  Well, folks, welcome.

25        We are here today on the defendant's motion in limine

1    to exclude the government's Rule 404(b) evidence.

2              I have read the memoranda.  So thank you all for your

3    good work for that.

4              I always hear from the movant first.  So, counsel, you

5    are the movant.  You can either come to the lectern, you can

6    remain at counsel table.  If you stay at the table, you can

7    either sit or stand.  So you have got plenty of options.

8              MR. RETURETA:  With the court's permission, I never

9    lose an opportunity to get to the lectern against Ms. Goldbarg

10   here.

11             THE COURT:  All right.

12             MR. RETURETA:  Your Honor, thank you for the

13   hospitality.

14             The motion we filed, we filed that because, as we

15   noted in our pleading, we're a little bit surprised by the

16   amount of information that the government has suggested that

17   they want to put on.

18             I'm not sure if the court is aware, at about the same

19   time that we filed, at that time it was a notice for 404(b)

20   evidence, we also filed a motion for a bill of particulars; we

21   also filed a motion to suppress statements that are alleged to

22   have been made by my client.

23             I think the underlying current with what's happening

24   here is we seem to -- we have been presented with a course of

25   conduct that I would think would be very definite, would have

1    parameters, would be easy to explain to a jury why certain

2    events constitute a fraud, constitute a bribe, constitute

3    something illegal that would be subject to the U.S. Code.  We

4    are still kind of perplexed by that.

5         What we have discovered, and I don't want to rehash

6    our pleading, but I think what we have discovered is we

7    continue to hear from the government that all of these things

8    happened and it is all dependent upon Mr. Escalona just

9    confessing to everything.

10        There are references to coconspirators in the

11   government's pleading.  There is a coconspirator one and

12   coconspirator two.  We believe that those two individuals, one

13   individual is a person by the name of Salomon Bendayan.  The

14   other individual is a person by the name of David Bendayan.

15        David Bendayan, as far as I know, has not pleaded

16   guilty to any illegal conduct.  That is significant because his

17   brother, Salomon Bendayan, has pled guilty to illegal conduct,

18   and the illegal conduct that he has pled guilty to in the

19   Southern District of Florida is that he is running a money

20   transferring office without the appropriate documentation.

21        Now, a quick reading of the government's 404 pleadings

22   would indicate that Salomon Bendayan is a master coconspirator

23   along with Mr. Escalona.  So we are perplexed by the linkage

24   with the Bendayans.  Our concern then stretches into the world

25   of 404(b).

1            Again, 404(b) in this case, the way it is charged,

2       there are either bribes, there are either fraudulent transport

3       documents, because it is alleged that there was some type of

4       movement of goods, and maybe the goods were not moved or the

5       goods that were moved were of a different percentage quantity

6       but import into Venezuela, but there is this type of conduct

7       that then needs to be bolstered because that is what we're

8       dealing with here with 404(b); we're dealing with other crimes

9       that somehow help the government put together motive, conduct,

10      the whole realm of 404(b).  We don't understand why that is

11      necessary.

12           Not understanding it is significant because we have

13      our bill of particulars, but not understanding it then spills

14      over into the prejudice side of this, because right now a jury

15      is going to have an alleged conspiracy dating from 2010 to

16      2017, but then they are supposed to receive, digest, understand

17      and somehow link up conduct that could be, and we don't know

18      because we don't know the specifics of it other than the grand

19      allegation of a decade prior to, the beginning of the alleged

20      conspiracy.

21           So the government has proposed to the trial court that

22      Mr. Escalona's jury be able to hear something that happened in

23      2002, '3, '4, or '5.  As the government's pleading indicates,

24      it is sufficiently intrinsic or qualifying under 404(b) as

25      something that a jury can use.

1          We have encountered 404(b) with lengthy conduct

2     before.  What is perplexing to us, because we have that problem

3     with the bill of particulars, we still don't understand what

4     the government's theory of this case is so that we can defend

5     it.  It only aggravates what is happening with 404(b).  We

6     don't know if 404(b) is that Mr. Escalona sent a package of

7     Kohler sinks to Venezuela and somehow that's illegal.  We don't

8     understand if Mr. Escalona sent a package of Delta sinks in

9     2002 would be admissible because that is 404(b), because he is

10    sending something to Venezuela.

11         So we're concerned with what the government has

12    proposed, the expanse, the lack of detail, and we don't know

13    the particulars of what is being alleged in terms of conduct

14    for the indictment.

15         Putting that altogether, we feel like we are going to

16    be in trial and if this were to be allowed and not scaled back

17    in some way, we would be popping up every other question saying

18    objection, relevance, objection, prejudice, objection again and

19    again and again.

20         So if the government were to present us with the

21    specifics of what they want to introduce -- as an example, if

22    they are to say, well, Mr. Escalona dealt with Salomon Bendayan

23    in 2004 and they transported a load and that load was supposed

24    to have a hundred widgets but really only had five widgets,

25    well, at least we could identify it, at least we could respond

1    to it, at least we could argue whether or not it is probative

2    and not outweighed by some level of prejudice that would affect

3    Mr. Escalona.

4         So coming back around, there is confusion as to how

5    the government is packaging this case; there is confusion as to

6    what they're looking to present in their case in chief, let

7    alone an entire decade on conduct which we have nothing further

8    than their pleading and another series of acts that are not

9    specified.

10        THE COURT:  Have you received any additional

11   information from the government which would help you better

12   understand the 404(b) evidence, or perhaps called the

13   inextricably intertwined intrinsic evidence?

14        MR. RETURETA:  No.

15        THE COURT:  Let me just finish.  Just so we are on the

16   same page, I'm talking about the evidence which apparently

17   would concern the years 2000 through 2010.

18        So you can't see what's going on behind you because

19   you're looking at me.  I have the benefit of sitting up here

20   looking at the whole courtroom.  So I can see you and I can see

21   the prosecutor.  So when I asked has the government given you

22   anything, any documents to give you some greater understanding,

23   you nodded no.  She vigorously nodded yes.  So that is the same

24   position that they took in their response, both in this motion

25   and also in the motion for the bill of particulars.

1          That motion, the one for the bill of particulars, has

2    not been referred to me by Judge Scola.  But in getting ready

3    for the hearing I read that motion and the response anyway.

4          Overall, the government's position is we have given

5    the defense massive amounts of information, documents,

6    discovery, and, therefore, it is not simply a matter of them

7    not understanding what the case is about, it's spelled out in

8    the documents.

9          So let's talk about your hypothetical.  You said to

10   me, gee, Judge, what if they say that in the year 2003 my

11   client was involved in paperwork spelling that five widgets

12   were shipped but it was actually 25 widgets.

13         If the government in discovery or otherwise sent you

14   documents or reports or other information showing the shipping

15   documents representing X number of widgets and other documents

16   showing that a different number of widgets was actually

17   shipped, then you and your client and your team should have a

18   good idea of at least that one group of events concerning the

19   widgets.

20         Now, has the government in fact provided you with that

21   kind of information, either actual transactional documents,

22   reports, statements, memoranda, explanations or otherwise, to

23   help you understand what's going on?  Because the impression

24   that you present to me is, Judge, we have a huge case; it's

25   enshrouded in a dark curtain; the government hasn't pulled

1    aside the curtain; we haven't been able to peek in; we know

2    nothing, and we can't adequately even begin to prepare our

3    defense.  So those are two completely different perspectives of

4    what is happening here.

5         I will hear from the government in a few minutes, but

6    right now give me a feel for what you have been provided with.

7         MR. RETURETA:  Let me begin by answering the first

8    question you asked, your Honor.  Have they given us something

9    which shows this.  Have they given us documents.  Yes.  Have

10   they given us bills of lading.  Absolutely.  Have they given us

11   other permissions that are part of the process of importing

12   goods into Venezuela.  Absolutely.  Then it stops.  It stops

13   and then there's reliance on two things.

14        They make reference to cooperating witnesses, which we

15   have not received any Jencks yet, we have not received anything

16   that would allow us to get into whatever they're declaring.

17   Then the other part, which is the basis of our motion to

18   suppress, there are supposedly alleged confessions by

19   Mr. Escalona.  Those alleged confessions allegedly took place

20   five times.  Those are then the connectors between the nodding

21   of yes and my denying no, because there is not that linkage.

22   There is not a document or a photograph which shows a container

23   leaving Port Everglades and arriving in Caracas, full here,

24   one-fifth of the way empty in Caracas.  There is none of that.

25        So what we are looking at is, there is not a

1    black-and-white basis for them to say, look, here it is, here

2    it is, it is right there.  It is cooperators.  The cooperators,

3    again, I referenced have not pled guilty to a conspiracy, were

4    a part of an investigation in Boston that suddenly got morphed

5    into Southern District, and they do not seem to be the most

6    knowledgeable about what is being alleged here.

7            But then it gets back to Mr. Escalona and I'm

8    presented with allegations from two very respected DEA agents,

9    that I have worked with before, but I've never encountered an

10   absolute, complete, four-cornered, full-blown confession to

11   everything.

12           THE COURT:  So these two DEA agents who you mentioned,

13   are they the ones who purportedly interviewed your client and

14   obtained the so-called confessions?

15           MR. RETURETA:  Yes.

16           THE COURT:  All right.  Have you been provided with

17   their DEA-6 reports?

18           MR. RETURETA:  I have been provided with reports which

19   indicate that they have this information and, as is stated in

20   the reports, he confessed to us.  What I have not been provided

21   and what I am accustomed to with confessions is a statement.

22           THE COURT:  Let's take it just a step at a time.

23   There are DEA-6 reports and there are DEA-6 reports.  You make

24   it sound -- and I haven't seen the reports.  I haven't seen

25   these reports.  I have in my 40-year career seen DEA-6 reports,

1    and depending on the author and the circumstances, those

2    reports could be succinct, conclusory, detail free, and, for

3    example, hypothetically in this case, the DEA-6 reports could

4    be two sentences long saying, on March 1st, 9th, and 13th of

5    2022 we interviewed Mr. Escalona at a Denny's restaurant near

6    the airport.  By the way, it is always a bad thing when you are

7    meeting somebody at that Denny's restaurant near the airport.

8    That Denny's restaurant ought to be a museum, as a matter of

9    fact.

10           In any event, let's say the report says that, sentence

11   one.  Sentence two, he confessed to bribing myriad Venezuelan

12   officials from 2000 to 2010, period, end of report.  That's one

13   kind of report.

14           Another report could say they interviewed Mr. Escalona

15   five times over a period of six months; the total amount of

16   interviews was 30 hours; the interview was tape recorded; they

17   took comprehensive notes, and he provided the following

18   information, and there may be seven, eight, ten pages of more

19   specific information, breaking down on a broad-by-broad basis

20   or a shipment-by-shipment basis or a category of shipment

21   basis.  For example, he shipped widgets, he shipped apples, he

22   shipped washers used in oil equipment, whatever.

23           So these reports that you got from the two DEA agents,

24   which type of report do they fit into, or maybe they are in a

25   different category?

```
1            MR. RETURETA:  The former.

2            THE COURT:  Meaning, very succinct and conclusory?

3            MR. RETURETA:  He met on this day -- one of the early

4     reports, I think one of the first ones, after we met the first

5     time, and these are the people that he said he bribed.

6            THE COURT:  OK.  So it lists, if we want to use the

7     old law school phrasing of "or" and "ee," briber, bribee.  I

8     don't know if there is such a word.  I know there is mortgagor,

9     promisee.  Let's assume there is a word called bribee.

10            MR. RETURETA:  The bribee.

11            THE COURT:  The bribee.  So you could list the names

12    of the bribees.

13            MR. RETURETA:  Yes.  I believe they list six bribees.

14            THE COURT:  OK.  Any other details?

15            MR. RETURETA:  We know that they sat on some patio

16    furniture.  We know that they were outside.  There is no

17    mention of a Denny's.

18            What I'm accustomed to, using your Honor's spectrum

19    there, that side of the spectrum that is the latter in your

20    example, that we met for these times, and he detailed one, two,

21    three, four, five, and he admitted that this was happening.

22    This was more of a we met, information was given, and, oh, by

23    the way, he said he bribed these people.

24            It just doesn't fit into what he was doing because the

25    defense right now is that those documents that are mentioned
```

1    are pretty much the documents that he gave the agents way back

2    when.  So we're familiar with them because he can detail them

3    step by step by step.

4          So as I was getting into this, it is just baffling to

5    me that this individual, that I have come to know, that is very

6    well known to those two agents, would say, well, guess what,

7    you know, I was just doing something illegal.  Can that happen?

8    Absolutely.  Is it consistent with what I see in the reports?

9    Absolutely not.  Those reports should be replete with the

10   amount of information that that person has.  They are and then

11   there is a sentence.

12         THE COURT:  All right.  So I take it that, as far as

13   you know, these meetings where your client supposedly made

14   statements were not recorded, either audibly or through

15   videotape, as far as you know.

16         MR. RETURETA:  I have received nothing regarding that,

17   and as far as I know --

18         THE COURT:  That is a separate issue --

19         MR. RETURETA:  Right.

20         THE COURT:  -- whether you have received anything.

21         But in conversations with Ms. Goldbarg or the agents,

22   have you received, one way or another, whether these

23   conversations were recorded?

24         MR. RETURETA:  No.

25         THE COURT:  And behind you Ms. Goldbarg is shaking her

1    head indicating no.

2              MS. GOLDBARG:  Correct.

3              THE COURT:  All right.

4              MR. RETURETA:  What I have heard in addition to and

5    not in the report is that there were other individuals present.

6    In fact, I've heard that one of the attorneys of record for the

7    government, Joseph Palazzo, was at such a meeting and heard.  I

8    heard that former assistant U.S. attorney Michael Nadler was at

9    another one of these meetings.

10             Now, if there is a confession, what I have always said

11   to Mr. Escalona, I would love to see a report which indicates

12   that on this day a meeting was held at the U.S. Attorney's

13   Office in Miami and present were the following prosecutors and

14   following agents and that Mr. Escalona confessed to conduct,

15   boom.  Nothing like that.

16             THE COURT:  Well, that may be because no such report

17   exists.  Gosh, what is the expression.  "If wishes we were

18   horses, beggars would ride."

19             I mean, yes, as a defense lawyer, of course you'd want

20   a more detailed report.  If there is not one to turn over, you

21   can't get blood out of a stone.

22             Let me hear from Ms. Goldbarg and maybe she will have

23   a little bit of a different take on this.

24             MR. RETURETA:  Thank you, your Honor.

25             THE COURT:  Again, you can sit or stand at the counsel

1    table or come to the lectern.

2              MS. GOLDBARG:  I have a lot of paperwork.  I'll stand

3    here.

4              I think it would be fair to say that Mr. Retureta is

5    disappointed with the form in which the government has produced

6    its discovery.  He would like something that is replete.  Well,

7    I mean, that is not what we have here, and I think your Honor

8    picked up on that.

9              The defendant did meet with the agents, and all the

10   reports were provided.  There were actual meetings that the

11   government had when Mr. Retureta was retained, with the

12   defendant present, where we explained what had happened at

13   those meetings and we provided more context.

14             Before the defendant was charged, we did provide

15   documents.  Yes, many of them are the documents that the

16   defendant gave us, but as the reports indicate and as the

17   agents will testify when there is a hearing in the motion to

18   suppress, which it seems like he's trying to shoehorn into the

19   argument here, the agents approached the defendant because they

20   explained to him that they were investigating this money

21   laundering scheme of Venezuela and they understood that the

22   defendant was involved, and the defendant admitted it and then

23   the defendant proceeded to explain how this scheme worked.  In

24   doing so he provided emails and he provided -- in which he

25   explained how the fraud worked, including that there were

1    various shipments that were purported to be one product and

2    were in fact not that product, or diluted product, and that is

3    part of the scheme.

4            He also provided the justification of the paperwork,

5    the official paperwork that was signed and approved as in

6    furtherance of the scheme.

7            It isn't a simple scheme.  I think that we tried to

8    make this succinct, but it's not easy.  It is not easy to

9    explain how it is that the defendant and the codefendants were

10   doing arbitrage of the exchange system in Venezuela to make

11   tens and tens of millions of dollars.  It is complicated.  And

12   the defendant was approached so that he could explain and help

13   the investigators with their investigation into the scheme.

14           For reasons, that cooperation did not flourish and

15   this is where we tried to have conversations to resolve the

16   matter, and the parties just went their separate ways, which is

17   how we end up here.

18           The issue here is 404(b), right.  We have provided the

19   defendant statements of what the charged conduct is, the scheme

20   from 2010 to 2017, how the defendant himself at the beginning

21   of the charged conspiracy was an officer of the National Guard

22   for Venezuela, the role that he played, the role that he played

23   once he left the Venezuelan military, how the scheme worked,

24   how the invoices were fraudulent, how they paid people bribes,

25   how they got the money out.  All that has been explained, not

1    only in the report that we provided, in the documents that we

2    provided, the emails, the reports, the wire transactions, the

3    tracing of all the assets.  All that has been produced.

4             Now, the government has --

5             THE COURT:  I'm sorry for interrupting.

6             MS. GOLDBARG:  Yes.

7             THE COURT:  When you say it's been explained, you've

8    told me that it is not a simple scheme.

9             MS. GOLDBARG:  It's not.

10            THE COURT:  It's complex.

11            MS. GOLDBARG:  Correct.

12            THE COURT:  And the minute you mention the word

13   arbitrage --

14            MS. GOLDBARG:  Correct.

15            THE COURT:  -- by definition it's going to be a

16   complicated matter.

17            MS. GOLDBARG:  100 percent.

18            THE COURT:  So when you say we explained, do you mean

19   that in addition to turning over reports, in addition to

20   turning over transactional documents --

21            MS. GOLDBARG:  Correct.

22            THE COURT:  -- you also in some way, form, or fashion

23   explained, with you or another government representative, in

24   effect, in the role of a de facto teacher and defense counsel

25   in the role of the student who is listening, so maybe you sat

1   down and just for an hour said, listen, let me tell you what

2   the case is all about.

3          MS. GOLDBARG:  Correct.

4          THE COURT:  Something like that.

5          MS. GOLDBARG:  Absolutely.

6          THE COURT:  That has happened.

7          MS. GOLDBARG:  Correct.

8          THE COURT:  With defense counsel.

9          MS. GOLDBARG:  With this defense counsel, with myself,

10  with my cocounsel as well, with the defendant present as well

11  as the agents.

12         Now, I think that there is perhaps a conceptual

13  disagreement, where defense counsel seems to think that all the

14  invoices and all the receipts justify and show that what the

15  defendant was doing was legal, at which time we also explained,

16  with the agents present, the admissions that the defendant

17  made, and, quite frankly, your Honor, a lot of what the

18  government learned about how the arbitrage worked, yes, was

19  through some cooperating witnesses, but it was also the

20  information that was provided and the insight provided by the

21  defendant himself.  So yes, the defendant provided us with

22  documentation that helped further explain the complexity of the

23  scheme.

24         So I know this kind of bleeds, and I appreciate the

25  court reading the government's response for the bill of

1    particulars, defense counsel made a request of us asking for

2    more details.  We responded in writing.  We even

3    cross-referenced the Bates-stamp numbers that we did.  He made

4    the same request in a filing.  We pretty much responded the

5    same way, and we believe that we have.

6            Now the only thing that the government hasn't provided

7    at this point in time is the Jencks material, that we are not

8    required to at this point in time.  I understand that defense

9    counsel would like it.  As we get ready for trial, then the

10   defense counsel will have it.  But it doesn't seem, based on

11   what the government has disclosed up to this point, that he is

12   in the dark.  He may not like the answers that he's getting or

13   he may -- look, he can have a field day cross-examining the

14   agents on what they did and didn't put in their reports, and he

15   is allowed to do that in front of a jury or in front of whoever

16   is going to hear the motion to suppress so that they can weigh

17   the credibility of that information, but him not liking the

18   tenor or the content or the quantity of information in the

19   reports doesn't lessen the fact that the government has gone

20   through and has provided the defendant and his attorney the

21   information that we are going to proceed on for the charged

22   conduct.

23           Why are we here with this motion?  The defendant, as I

24   mentioned before, in 2010 was in the National Guard for

25   Venezuela.  There are witnesses who are going to testify that

1    were part of this scheme and this conspiracy with the

2    defendant, but their relationship did not start in 2010.  As we

3    laid out in our motion, this relationship happened

4    approximately a decade before, and it started with the

5    introduction by a broker, a broker who introduced the witnesses

6    to the defendant, and there started the relationship where the

7    defendant, in his role as running one of the ports, a very

8    important port for the import of goods, agreed to and accepted

9    bribes by the witnesses that are going to testify.

10           The government's position and my personal opinion

11   would be that this is inexplicably intertwined.  You can't have

12   witnesses testify how they knew the defendant engaged in the

13   conduct and how they engaged in the conduct without talking

14   about how they first met the defendant.

15           They met the defendant when he was in charge of a port

16   where this person was smuggling goods into the country and when

17   one of the containers was seized.  Through their broker they

18   said, what do we do to get this container out, and it was the

19   defendant -- they were introduced to the defendant.  They paid

20   a cash bribery payment to the defendant so that their goods can

21   make it into the country.  That started the relationship, and

22   there were bribery payments that were made while he was in this

23   position as a National Guard with the Venezuelan forces and

24   these witnesses.  That is how it started.

25           As the reality of the situation changed in Venezuela,

1    as there is the formalization of country controls and an entire

2    institution geared toward controlling the currency and you have

3    arbitrage, it gets very complicated.  These witnesses and the

4    defendant enter into a business.  So it is no longer them

5    paying him a bribe, they go into business with him.  So he is

6    now partaking in that business.  This predates the 2010 start

7    of the conspiracy.

8         So the evidence that these witnesses will testify to,

9    not only does it describe their own criminal conduct but it

10   also puts into context how it is that they met the defendant,

11   and it also goes to, if the court were to see this as not

12   inextricably intertwined, it goes to the permissible arguments

13   for 404(b), which is absent mistake, motive, etc.

14        So that is the first part of the evidence that the

15   government is seeking to introduce via 404(b).

16        Again, I am going to assume Mr. Retureta would want to

17   do a wonderful job of cross-examining whoever the government

18   witnesses are, but it is almost unfair and it leaves a doubt

19   for the jury to explain, well, how is it that they met the

20   defendant, because if they can't talk about that period

21   beforehand as a basis to evaluate their credibility, it's

22   leaving holes in the story.

23        So that is number one.  There is also the request for

24   404(b) evidence on the end side of the conspiracy, which is

25   what did the defendant do with all this money.

1        The witnesses will testify about their written

2   communications where the defendant is instructing other

3   coconspirators what to do with his proceeds and his profits.

4   The agents in tracking that information down soon learned that

5   the defendant involved his family members to assist him in

6   helping clean or launder the proceeds of his money laundering

7   activity, and that leads to the financial transactions and wire

8   transfers to the United States, to Switzerland, and the

9   purchase of property here in the United States, in the Southern

10  District of Florida specifically.

11       So also, under the rule of completeness, it explains

12  not only things that the defendant said but it is the actions

13  that the agent took to fully corroborate what the defendant was

14  telling the agents, and then also follows the money trail in

15  terms of what actually happened at the end of this money

16  laundering conspiracy.

17       So the government would also argue that that evidence

18  should also be introduced as inextricably intertwined, but in

19  an abundance of caution it should be admitted under 404(b).

20       THE COURT:  I have a few questions.

21       MS. GOLDBARG:  Yes, sir.

22       THE COURT:  Have you ever worked as a criminal defense

23  lawyer?

24       MS. GOLDBARG:  I have not.

25       THE COURT:  So you have a limited perspective.  I

1    don't say that to fault you; I'm just saying you have never

2    been on the other side of the aisle, so to speak.

3            MS. GOLDBARG:  That's correct.

4            THE COURT:  So let's talk about a more typical 404(b)

5    scenario.  Let's say it's your basic buy/bust and the

6    government wants to introduce as 404(b) evidence one prior

7    transaction, and the 404(b) evidence is that a year and a half

8    ago the defendant sold 2 ounces of cocaine to a guy named Dave

9    in the parking lot of a shopping center in North Miami for X

10   dollars.

11           Now, if you're the defense lawyer, you're going to

12   fight like all get out to try to exclude that.  But if you

13   can't exclude it as 404(b), you at least have something to work

14   with.  By that I mean, you can investigate that alleged prior

15   act to see whether or not there is any surveillance footage

16   from that shopping center; you can try to contact the other

17   alleged participants to see whether he or she will confirm the

18   transaction; you can do a records research to find out, gosh,

19   wouldn't it be a great cross-examination if you could

20   conclusively determine that the so-called buyer was actually in

21   a state prison in Mississippi and couldn't have participated at

22   all.

23           So the point is from a defense perspective for 404(b)

24   it is important often to find out the contours of the prior act

25   so that you can start to probe the legitimacy of the alleged

1    prior bad act.

2            So, yes, the government only needs to prove that by a

3    preponderance of the evidence, not reasonable doubt, but you at

4    least don't have to accept at face value the 404(b) notice.

5    You could probe it, investigate it, look into it.

6            MS. GOLDBARG:  Correct.

7            THE COURT:  Are you with me so far?

8            MS. GOLDBARG:  Yes.

9            THE COURT:  It sounds to me like what we have here is

10   something completely different.  We don't have necessarily --

11   and I'm saying this because if I'm wrong, I would like you to

12   tell me.  It seems to me what we have here is a more sprawling

13   allegation of 404(b) evidence, and it is not just one act, it

14   is many acts.

15           Now, if I were to ask you can you tell me how many

16   specific bribes are at issue in the 404(b) evidence, would you

17   be able to tell me?

18           MS. GOLDBARG:  We would be able to provide an

19   approximation.

20           THE COURT:  What is that number?

21           MS. GOLDBARG:  It would have been for about one

22   container a month for probably three, probably about three

23   years.

24           THE COURT:  All right.  So that is about 36 bribes,

25   more or less.

1          MS. GOLDBARG:  From what I understand, there is an

2    agreement between the witness and the defendant where the

3    witness would just pay more of a salary to the defendant to

4    cover --

5          THE COURT:  All right.  Let's frame it differently

6    then.  Bribes concerning approximately 36 shipments.

7          MS. GOLDBARG:  Correct.

8          THE COURT:  It could have been one huge bribe to cover

9    all 36 shipments.

10          MS. GOLDBARG:  Correct.

11          THE COURT:  Just like here in Miami if you're a major

12    law firm, maybe you give the head maitre d' at Joe's Stone Crab

13    a certain amount at the beginning of the season and that covers

14    all your lunches and dinner for the season or you could do it a

15    meal at a time.

16          MS. GOLDBARG:  Correct.

17          THE COURT:  So 36 shipments.

18          Have you provided in some form or fashion the

19    identification of the shipments associated with the alleged

20    404(b) bribes?

21          MS. GOLDBARG:  I believe, your Honor, we have provided

22    the financial records that show the payments.  We have got this

23    initial payment of these corruption payments and then you have

24    the transition to the partnership.

25          So we provided the name of the broker in the

1  pleadings.  So they have that information.  We also provided

2  the financial records where I believe the payments are made to

3  the company controlled by the broker as part of the scheme.  I

4  think the majority of the details of the information would come

5  from the 3500 material, through Jencks Act.

6         THE COURT:  Do you have any sense now about when you

7  might be providing the Jencks material?  I understand it is not

8  required at this point.

9         MS. GOLDBARG:  There is a potential that there may be

10  a request to adjourn the trial.  I think the idea would have

11  been to provide it a few weeks before the beginning of trial.

12         THE COURT:  Say it again.

13         MS. GOLDBARG:  A few weeks before the beginning of

14  trial.

15         THE COURT:  How would that involve an adjournment of

16  the trial if it took place before the trial started?

17         MS. GOLDBARG:  No.  I'm just saying that I think there

18  may be a request.  Currently we have a May 8th trial date set

19  forth.  So we would produce it approximately two weeks before,

20  although I believe there may be a request by defense to adjourn

21  the trial.  So regardless of the start of trial, I think it

22  would be a few weeks before trial to produce the material.

23         THE COURT:  Meaning the Jencks material.

24         MS. GOLDBARG:  Yes, your Honor.  Sorry.

25         THE COURT:  And speaking holistically, is it your

1  position that once defense counsel obtains this Jencks material

2  that he, perhaps even in cooperation with his client, would be

3  able to learn the specifics of the transactions at issue in the

4  404(b) evidence, regardless of whether it is classified as

5  intrinsic or extrinsic?

6          MS. GOLDBARG:  To his satisfaction, I'm --

7          THE COURT:  I didn't say to his satisfaction.  Would

8  more details be forthcoming to the extent that it would help

9  any reasonable person have a feel for the specifics of the

10 actual shipments?

11         MS. GOLDBARG:  The additional information would

12 provide specifics in terms of who made the connection,

13 approximately when the connection was made, what the connection

14 was, and how the nature of their relationship changed, and this

15 covers kind of that pre-2010 period.  So yes, I believe it

16 would.

17         THE COURT:  How important to your case in chief is the

18 404(b) evidence that you'd like to use if it is not admitted

19 under the theory that it is intrinsic and inextricably

20 intertwined in the charged conduct?

21         MS. GOLDBARG:  It provides crucial context for the

22 witnesses' testimony, the existence or the creation or how this

23 plan evolved, how the defendant became involved in it, how he

24 grew in it.

25         A lot of the criminal conduct in 2010 requires

1    context.  So it would be, I think, extremely confusing to the

2    jury for them not to understand how it is that it started, how

3    it evolved from just simply containers being smuggled over the

4    border to this arbitrage and what role the defendant played in

5    that, again, absent of mistake or confusion, that this is

6    purposeful.  I think it would hinder, again, given the

7    complexity of the case, I think it would hinder the jury's

8    comprehension of the scope.

9         THE COURT:  All right.  Mr. Retureta, anything further

10   from you, sir?

11        MR. RETURETA:  I think we've taken you to what is

12   happening between defense and government.  I will give this

13   example.

14        It should be very easy for the government to give me a

15   document per shipment, a permission for the import of that

16   shipment into Venezuela, a receipt that verifies the receipt of

17   that material in Venezuela, and then to tell me that the port

18   person in Caracas received a bribe from Mr. Escalona and it was

19   because of that bribe that the locks on that shipping container

20   were not broken and what was 100 widgets really turned out to

21   be five widgets.  It should be very simple for that to be

22   presented to the defense.

23        I have asked since the first moment that I have sat

24   down with that man of the government, give me an example, give

25   me one example that would show me that all of the documents

1    that he provided to the government somehow or another are

2    explained as a grand fraud bribery scheme.  I have not received

3    it to this point and we still have not heard it in the answers

4    provided to the court.  That is our frustration.  Because then

5    from there I can tell him, way to go, knucklehead, you just

6    gave them everything; I can see it right here.

7         We talked about the complexity.  This is not complex.

8    It should not be complex.  It is because we have not been told

9    what the fraud is.  We have not been told who was bribed.  We

10   have not been told how this worked, when it should be very

11   easy, and that's us.  Let's not even think of the poor members

12   of this community that have to listen to this.

13        We need to have that.  If we can't have it here in

14   court, I don't know how we are going to explain it to a jury.

15        My fear, and I think your Honor asked some of the key

16   questions, how much do you need of this 404(b), because from

17   what I'm hearing it could be as simple as the coconspirator one

18   having lunch at Denny's with him twice a week for five years

19   prior to.

20        THE COURT:  Mr. Retureta, here's the rub.  Let me just

21   tell you what I'm thinking and then you will give me your

22   response.

23        We don't live in an ideal world created by criminal

24   defense lawyers.  We deal with what the framework is for the

25   federal criminal prosecution of defendants and the applicable

1    rules.

2            I understand that any defense lawyer in your position

3    would want the government to lay everything out on a silver

4    platter.  Tell me, Ms. Goldbarg, give me an illustrative

5    example of one of these transactions so I can understand how

6    your theory works and so I can have a meaningful conversation

7    with my client.

8            If she chooses to give it to you, that's fine, but

9    most of the time criminal cases don't unfold that way.  It is

10   not like you are in a civil lawsuit where you can propound an

11   interrogatory to the opposing side, the government, and say,

12   please explain in detail how a typical bribe scenario works.

13   That is interrogatory one.  Interrogatory number two, list the

14   dates of each of the shipments at issue in your 404(b)

15   evidence.  Interrogatory number three, please explain in

16   detail, in your own words, exactly what I need to know in order

17   to have a candid conversation with my client.

18           Now, in a civil case you could propound

19   interrogatories like that, you could take a deposition.  We are

20   in a criminal case, and the reality is, as you and I both know,

21   the defense is, under the rules, required to operate with less

22   discovery tools than in a civil case.  That is how it works.

23           So when you say to me I want the government to explain

24   these things to me, I want the government to show me the

25   documents, are you, number one, suggesting, because this is

```
 1    what it sounds like to me, are you suggesting that you want

 2    Ms. Goldbarg to create a document, a memorandum, a report,

 3    report from prosecutor to defense counsel, hey, it was great

 4    seeing you the other day in court, in Judge Goodman; let me

 5    reveal to you our theory of the case and explain to you how we

 6    plan on linking all the documents in the case?  From a defense

 7    lawyer's perspective, fantastic.

 8            I'm not aware of any statute, rule, or other legal

 9    authority which would require the government to do that.  Are

10    you?

11            MR. RETURETA:  Let me give credit where credit is due.

12    Palazzo did that.  Mr. Palazzo --

13            THE COURT:  Perhaps he was being wonderfully generous

14    with you.  My question is, is there any principle of law that

15    would require it?

16            MR. RETURETA:  No, absolutely not.

17            THE COURT:  All right.

18            MR. RETURETA:  Absolutely not.

19            THE COURT:  So maybe you earlier in this case

20    persuaded Mr. Palazzo to go the extra mile and turn over

21    something that wasn't required, and if so, wonderful for you,

22    you're a very persuasive lawyer.

23            Now that Mr. Palazzo did that apparently one time,

24    maybe you are returning to the well for a second visit, making

25    another request, and this time he says, nah, I think I'm good,
```

1   I've already given you enough help, quite frankly.

2          MR. RETURETA:  Let me just fill in a little bit more.

3          THE COURT:  Sure.

4          MR. RETURETA:  Like I said, we have always asked, give

5   us an example, give us an example of the shipment.

6          THE COURT:  Tell me in real life the mechanics, the

7   logistics.

8          MR. RETURETA:  Because --

9          THE COURT:  When you say to me we want them to tell us

10  how, tell me specifically the method by which you would like

11  Ms. Goldbarg to tell you that answer.

12         MR. RETURETA:  Just identify -- for example, they are

13  going to be in front of this jury and they are going to have to

14  tell the jury, aside from the allegations of fraud and bribery,

15  whatever, this is what happened with this shipment.  So I asked

16  the government, can you give me an example of a particular

17  shipment.  Mr. Palazzo was kind enough -- I'm sure in consult

18  with Ms. Goldbarg, because she would have done it also -- they

19  provided me and showed me a shipment.  I asked, what's wrong

20  with this shipment.  Well, this is an example of what our case

21  will be, and we will --

22         THE COURT:  Wait, because I need to understand this in

23  my mind.  I want to get a mental image of this.

24         This didn't happen through a written report that they

25  gave you or a memo.  They sat down with you or over the phone

1    or in a Zoom hearing or in person, a good old-fashioned

2    conversation.

3                MR. RETURETA:  Good old-fashioned conversation.

4                THE COURT:  Words came out of their mouth.  You

5    listened.

6                MR. RETURETA:  With colleagues that have known each

7    other for a long time.

8                THE COURT:  Sure.

9                MR. RETURETA:  We had the conversation and I said,

10   give me an example.

11               THE COURT:  And did they have, for example, a bill of

12   lading and they show it to you and they say, here's one.

13               MR. RETURETA:  We knew of a document that we were both

14   speaking of.

15               THE COURT:  All right.  So they orally volunteered

16   some information about one transaction.

17               MR. RETURETA:  Right.

18               THE COURT:  All right.

19               MR. RETURETA:  Which then led me to, what is the

20   illegality here, because what we're looking at here is all in

21   line with everything that happened.  Then we default to what I

22   continue to hear, which is, well, he just told us that it was.

23               So our frustration is we have this whole body of

24   material that pretty much, I'll say 90 percent of it has been

25   provided from Mr. Escalona to the government, that has been

1    passed through brokers, that has been signed off of by

2    government officials here and in Venezuela, and then we don't

3    know the other -- how does it get to this point.

4         Look, if Ms. Goldbarg was to say, look, this is the

5    way it is, it is what that is, your Honor, and then he said it

6    was all illegal and then he said that he paid off five

7    different people, I think that's where we're getting to, but I

8    can't believe we're getting to that because of what I have in

9    terms of material.  So I'm trying to figure out what else.

10        In figuring out what else, what are they going to

11   hear?  When they go back to deliberate, the first question I

12   would think is, does anybody know which semi-truck pulled up to

13   the port?  Does anybody know what container was used, or did he

14   just -- if that's to everything, then we might as well just

15   plead and say it's all guilty.  If that's it, wow, yes, I've

16   got a monster case in front of me, but I don't think that

17   should be it.

18        Then getting back to why we're here with the 404(b),

19   if we can't explain what is happening here, how do we then take

20   that and add more to it?

21        I think Ms. Goldbarg's suggestion with the background,

22   I think there is an argument there.  How do they know each

23   other?  They didn't just show up at Denny's together.  No.

24   They knew each other from so-and-so.  Does it need to get into

25   illegality?  Does it need to get into 36 containers, which is

1    the first time I've heard this?  How far do we get before we

2    move into the world of prejudicial?

3          Look, they knew each other.  They knew he was a former

4    military.  They knew that he could get things done.  They can

5    testify to that.  What am I going to do, start to open up that

6    door and explode that?  But to have, hey, listen, ladies and

7    gentlemen, he's a bad guy, there's been a lot of bribes and, by

8    the way, 36 times before we even decided to charge him, it's

9    this.  Then we don't know.  I think the court asked the perfect

10   question.  How do I investigate that?

11         THE COURT:  Well, let's see if we can't find out some

12   more specifics.

13         You have something that you wanted to say.

14         MS. GOLDBARG:  I'm sorry, your Honor.  He said my name

15   and I stood up.

16         I do believe that Mr. Retureta is conflating the

17   concern that he has with the merits of the case with what we

18   are here before with the 404(b) motion.  I know that you see me

19   nodding vigorously contrary to whatever assertion Mr. Retureta

20   is making.

21         The complaint lays out a perfect example of how it is

22   that the government explained to the defendant and his attorney

23   the nature of this case.

24         While the DEA report may not have been as fulsome as

25   Mr. Retureta would like, there is clear information in there in

1    which case the defendant explained and provided all of the

2    documentation to make a shipment seem legitimate.  It had the

3    proper paperwork, it had the proper seal, it had the proper

4    everything that was needed to check all the boxes to make it

5    look legitimate.

6         However, what Mr. Retureta has asked is, well, where

7    is the photo of the empty container.  Well, how do you know

8    that the container didn't make it.  First of all, we know it

9    because the defendant told the agents that it didn't make it.

10   So that may be something that we have to deal with at the

11   motion to suppress.  So that is the first thing.

12        There are other additional witnesses, and we have

13   indicated this in the pleadings, there are other witnesses who

14   will testify that as part of this conspiracy they also were

15   assured that this wasn't there.  We have included in that email

16   communications where the defendant himself has indicated that

17   what's going to be in the container isn't what is listed on the

18   paperwork, but it doesn't matter.  That's the scheme.  The

19   scheme is on paper.  It has to look like a certain product is

20   being imported into Venezuela in order for the Venezuelan

21   government to allow those U.S. dollars to be exported and wire

22   transferred out of Venezuela.  That's the scheme.

23        So we have told Mr. Retureta that and we have told him

24   that many times.  He filed a motion to suppress, which he has

25   every right to do, but we've told him.  He doesn't like the

1    answer.  He doesn't like the answer that this is how the scheme

2    worked.  It was made to look perfect.  And how do we know it

3    didn't happen?  Because his client told us and other people

4    told us, and communications not even to us, but emails that the

5    defendant wrote to his coconspirators show that the content of

6    the product was either diluted or it contained something else.

7    That was part of the artifice of the scheme.

8        THE COURT:  So if you had to give me a good-faith

9    estimate of the amount of time that you and your cocounsel and

10   your agents have spent explaining things about the case to

11   defense counsel, what would be a fair estimate?  Hours, days?

12       MS. GOLDBARG:  Hours.  Over many months.  I think that

13   we had initial meetings where we laid this out.  We had

14   conversations.  This was negotiations that took over several, I

15   would say several months.

16       I think it's important also -- the government didn't

17   put it in the motion to suppress because it doesn't need to be

18   in a public forum, but what is important, the context here is

19   the agents approached the defendant because they were seeking

20   his cooperation, and he agreed to cooperate, and that is why he

21   met and that is why he told the agents everything that he knew

22   about the scheme that he was being a part of, and that is why

23   he met with AUSAs and trial attorneys, predating me, and it was

24   with the goal of having to go out and work proactively for the

25   DEA agents.  Things didn't go well.

```
1            So the government was somewhat perplexed in terms of
2    why this defendant would want to not plead guilty, which were
3    the discussions, there were discussions, and proceed to trial.
4    That is his absolute right and he can.  There were attempts --
5    there was at least one, if not two, in person -- one meeting in
6    person, maybe another meeting via Zoom, and there had been
7    other conversations.
8            In attempts to try and answer his questions we
9    produced documents and other items prior to actually getting to
10   the position of charging the case via complaint, which we filed
11   in August of 2022.
12           MR. RETURETA:  Your Honor, if I may.
13           THE COURT:  Just one minute, please.
14           Yes, sir.
15           THE INTERPRETER:  Your Honor -- could you sit down and
16   get the microphone closer.
17           I'm sorry, your Honor.  I can't hear.
18           THE COURT:  You can probably pull the whole microphone
19   stand closer.  There you go.
20           MR. RETURETA:  Your Honor, there was one instance in
21   this building, in a meeting room of the U.S. Attorney's Office,
22   Mr. Palazzo and I discussed a specific document for that.  That
23   was the only time that the government has tried to explain to
24   me how this fraud worked other than general allegations.  My
25   client said it.  Have him tell you.  One meeting in this
```

1    building.  That is the only time that I have been presented

2    with an example of what they intend to put in front of the

3    jury.  That's it.  I just wanted to make that clear.

4         THE COURT:  When you say to me, Ms. Goldbarg, that

5    approximately one container per month for three years was

6    involved in this, that statement alone, would that tell defense

7    counsel which shipment was at issue or would he need further

8    information?

9         So here's what I'm thinking.  You know the case far

10   better than me, obviously, but let's just say there was only

11   one container shipped per month.  Then it would be obvious

12   which container it was.  It was the only one shipped that

13   month.

14        On the other hand, if the defendant was involved in

15   shipping seven or eight containers per month, only one of them

16   being involved in a fraud, how would his defense counsel know

17   which one of the eight constitutes the 404(b) evidence?  Do you

18   follow the undercurrent of my question?

19        MS. GOLDBARG:  I do, your Honor.  Perhaps --

20        THE COURT:  Is there an answer?

21        MS. GOLDBARG:  There is an answer in that in the

22   notice we provided the name of the Customs broker.  So knowing

23   who the Customs broker is, that gives the defendant and his

24   attorney indication, especially with the time frame that we're

25   dealing with, an indication of what transactions.

```
1              Now, the reason I hesitated, your Honor, is I don't
2    think it was the government's intention to go into a myriad of
3    details how many containers, how much money, how to do this,
4    and it seems as though to find a balance the government just
5    was providing context for how the witness and the defendant
6    knew each other without going into making this a sideshow about
7    what happened before we even charged the case.
8              The government did anticipate the question to be much
9    more higher level.  Not going into how many shipments, how much
10   did you pay, but just to provide context that there was a
11   context for which they met, what was the circumstances of how
12   they met and how they created the business together.
13             So we believe with that information, and especially
14   knowing who the broker is, having put her name in our pleading,
15   that would be able to provide the defendant and his counsel
16   with sufficient information.
17             THE COURT:  And is this a Customs broker who was
18   involved in activities before 2010?  In other words, the
19   404(b)-type scenario?
20             MS. GOLDBARG:  Yes.
21             THE COURT:  Yes.
22             MS. GOLDBARG:  So the broker is the person that
23   introduced the witness and the defendant at the beginning of
24   their relationship.  So this Customs broker is not charged or
25   necessarily involved in the charged conspiracy.
```

1          THE COURT:  I'm just getting back to the practical

2     reality of what defense lawyers do.  How do they work up a

3     case, how do they try and defend a case, how do they try and

4     get their arms around the charges and, in a 404(b) scenario,

5     how does the defense lawyer get prepared to deal with it.

6          MS. GOLDBARG:  Correct.

7          THE COURT:  As I indicated, one way is to look into

8     the bona fides of the alleged prior bad act.  So is it your

9     position that defense counsel by knowing the name of the

10    Customs broker would have enough information to adequately

11    investigate the transactions to see whether they occurred in

12    the way that the government claims they occurred?

13         MS. GOLDBARG:  Yes, your Honor.

14         MR. RETURETA:  Your Honor, if I may.

15         MS. GOLDBARG:  Mr. Retureta will not agree with that.

16         THE COURT:  Wait just a minute, please.

17         MR. RETURETA:  Certainly.

18         (Pause)

19         THE COURT:  Yes, sir.

20         MR. RETURETA:  Your Honor, we received that pleading.

21    In said pleading was the name of a woman.  That woman is

22    someone who worked with Mr. Escalona.  That woman was

23    immediately contacted.  I spoke with her.  That woman had never

24    been introduced by agents or prosecutors for the United States.

25    I have no idea why her name was included in there (inaudible)

1    that it happened.  Upon doing --

2            THE COURT:  What type of document was it that the

3    government filed in which her name is disclosed?

4            MR. RETURETA:  It is one of the 404(b), I believe it

5    is ECF-36.

6            THE COURT:  All right.

7            MR. RETURETA:  One of the notices of their intent to

8    introduce 404(b).  On page 2 they reference coconspirators one

9    and two, which I believe are the Bendayans.

10           THE COURT:  Yes.

11           MR. RETURETA:  And they mention this --

12           THE COURT:  Wait just a minute.  I'm on page 2 here.

13   Maybe I'm missing something.  I don't see the name of a woman

14   Customs broker.

15           MS. GOLDBARG:  Page 3, your Honor.

16           THE COURT:  Aha.

17           MS. GOLDBARG:  Summary of Possible Extrinsic Evidence,

18   second line.

19           THE COURT:  OK.  This is a publicly-filed document,

20   not under seal, correct?

21           MS. GOLDBARG:  Not under seal, your Honor, no.

22           THE COURT:  So we are talking about Grisalda Sampaio.

23           MS. GOLDBARG:  Yes, your Honor.

24           THE COURT:  All right.  So you're saying, sir, that

25   you spoke to Ms. Sampaio and she said she wasn't interviewed by

1    prosecutors or agents, denied any wrongdoing, and was offended.

2         MR. RETURETA:  I think the fair thing is, taking the

3    fact that her name was in a pleading and (inaudible), but that

4    is her side.

5         For our side we would love to have that information,

6    information that is (inaudible).

7         THE COURT:  All right.  So, folks, anything further

8    from either side?

9         MS. GOLDBARG:  With regard to the 404(b), no, your

10   Honor.

11        THE COURT:  That is the only motion that's been

12   referred to me.  That is all that is on my plate.

13        MR. RETURETA:  No, your Honor.

14        THE COURT:  OK.  Fine.  So here's what we are going to

15   do.  I am not going to rule today because I am giving each of

16   you a homework assignment.

17        You are certainly free to take notes.  I see you are

18   both going for your pads and grabbing your pens, and that's

19   fine.  Just understand that I will be issuing a post-hearing

20   administrative order specifying in writing precisely the nature

21   of the homework assignment because right now I am going to be

22   speaking off the top of my head and it is not going to be quite

23   as elegant and smooth as a written order.  You will at least

24   hear the gist of what it will be, and then we will talk about

25   your suggestion on how long each memorandum will be and then we

1    will discuss a deadline that makes sense.

2          I anticipate simultaneous filing.  Both the government

3    and the defense will file this homework assignment memorandum

4    on the same date.

5          I would like each side to submit a memorandum of law

6    discussing the government's ability to introduce Rule

7    404(b)-type evidence when the government does not pinpoint

8    specific criminal acts but, instead, refers more generally to

9    an ongoing course of criminal conduct.

10          For example, in a garden variety buy-and-bust drug

11    case, a Rule 404(b) disclosure might pinpoint a specific drug

12    transaction, probably a named illegal drug, a specific

13    location, a particular buyer, and a date or an approximate

14    date.

15          There might be a situation where the government's Rule

16    404(b) disclosure is simply the defendant has been a drug

17    dealer for the past three years in the South Florida area,

18    period.  As you can see, that disclosure doesn't provide any

19    specifics; it is simply more general.  It mentions course of

20    conduct.

21          I would like some case law and analysis discussing

22    that type of more general disclosure because it tends to relate

23    more to the type of disclosure we have here.

24          Here, we have a ten-year ongoing course of conduct

25    without, as best as I can tell, any list of particular

1   shipments which were purportedly involved in a fraud.

2          So that is what I'm looking for.

3          Now let's talk about how long it should be and when we

4   should be receiving it.

5          Remind again of your trial date.

6          MS. GOLDBARG:  May 8th, your Honor.

7          THE COURT:  May 8th, but you think that that is going

8   to be continued or you are simply suggesting that somebody

9   might file a motion but you're not sure how Judge Scola will

10  respond.

11         MR. RETURETA:  Your Honor, if I may.  It will probably

12  be more likely than not -- (inaudible).  We have to resolve

13  this.  We are finalizing (inaudible) those transcripts.  So it

14  will probably be more likely than not.

15         THE COURT:  All right.  So how about if I give you a

16  deadline of Monday, April 24th?

17         MS. GOLDBARG:  Fine for the government, your Honor.

18  Thank you.

19         THE COURT:  Next we will talk about the number of

20  pages and, more particularly, double-spaced pages.

21         Technically under the local rule you submit memos in

22  one-and-a-half spacing, but with 67-year-old eyes I don't do so

23  great with one-and-a-half spacing.  I prefer double.

24         Excluding the signature block and certificate of

25  service, which lawyers are always focused on, give me a feel

1    for how many pages you'd like.  Don't think that you need to

2    estimate high because you think we are going to negotiate and I

3    am going on chop you down.  Just tell me really what you think

4    you would need and how long it would take you to get the job

5    done for these limited issues.

6            What do you think?

7            MS. GOLDBARG:  Does that sound (inaudible).  Ten or

8    15.

9            MR. RETURETA:  Ten.

10           MS. GOLDBARG:  I'm looking at our pleadings and none

11   of our pleadings exceeded nine pages.

12           MR. RETURETA:  Just to be safe.

13           MS. GOLDBARG:  Defense counsel would like to be safe.

14   The government would defer to defense counsel.

15           MR. RETURETA:  I wouldn't think any more than ten,

16   your Honor.

17           THE COURT:  All right.  So let's make it ten

18   double-spaced pages.

19           MR. RETURETA:  Century or Times Roman.

20           THE COURT:  Right.  I'm not going to get into that

21   much minutia, but 12-point font, whatever you use.

22           So May 8th, double spaced.

23           MR. RETURETA:  I'm sorry, your Honor.

24           MS. GOLDBARG:  April 24th.

25           MR. RETURETA:  April 24th.

```
 1              THE COURT:  Yes.  May 8th is your trial date.  I meant
 2    April 24th.  Correct.
 3              Are you familiar with former Eleventh Circuit Judge
 4    Stanley Birch?
 5              (Inaudible)
 6              THE COURT:  Hopefully you as well.
 7              MS. GOLDBARG:  No, your Honor.
 8              THE COURT:  So Judge Birch had a favorite saying when
 9    he would discuss the length of briefs, especially if at oral
10    argument he asked for supplemental briefing.  Whenever he would
11    include the actual page limit, he would say don't treat that as
12    aspirational.
13              So yes, you have ten pages, but if you can get it done
14    in less, that will be fine.
15              I will share one other comment with you.  I believe
16    this was a comment that Chief Justice Roberts made at the
17    Eleventh Circuit conference in Atlanta.
18              Were you there for that?
19              MS. GOLDBARG:  No, your Honor.
20              MR. RETURETA:  I was not.
21              THE COURT:  Anyway, what he basically said was less is
22    more, keep it short, and he said, let me tell you what happens.
23    When we receive the briefs, if we see that your brief is
24    relatively thin and light, we start to like you right away.  So
25    the entire attitude as we are reading the brief is more
```

```
 1    positive.

 2              So that is on Chief Justice Roberts' comments, and I

 3    look forward to receiving your brief on the issue which will be

 4    articulated in a post-hearing administrative order.

 5              Are you returning to Washington today?

 6              MR. RETURETA:  I just took a glance outside and it

 7    looks like the weather is going to be with me, and I will.

 8              THE COURT:  You have something to add?

 9              MS. GOLDBARG:  I did want to ask one clarification,

10    your Honor, because I get the impression that some of the

11    court's concerns is the lack of detail, obviously, in the

12    motion, in the notice as well as the motion.

13              Obviously the government could provide much more

14    detail, and I don't know whether or not it would be -- how the

15    court would feel about the government providing what it would

16    expect the actual testimony to be, obviously not at the

17    30,000-foot view, but what we expect the witness testimony to

18    be more specifically.

19              I think that that -- I don't know if that would impact

20    the legal -- I mean, I don't think it is going to be the exact

21    date, what the weather was like that day or how many people

22    were present because we are talking about a large period of

23    time, but I think that we could get a little bit more granular

24    and don't know if the court would accept that as an aid to the

25    court's analysis.
```

1          THE COURT:  So it sort of reminds me of the answer to

2     the question where somebody said is your bank account

3     authorized to accept deposits.  Yes.  So I'm sure that I could

4     benefit from that additional level of detail.

5          In fairness, if you are going to do that, here's my

6     suggestion.  Whatever you are going to put together, file it on

7     CM/ECF --

8          MS. GOLDBARG:  Yes.

9          THE COURT:  -- so that defense counsel can see it, so

10    I can see it.  But by filing it before the deadline it will

11    give defense counsel an opportunity to adjust, if necessary,

12    his arguments, and it will also help inform your arguments as

13    well.  Depending on what is in the submission, it might have an

14    impact on the ruling.

15         At the risk of stating the obvious, the sooner that

16    the submission is made, the better.

17         MS. GOLDBARG:  Yes, your Honor.

18         THE COURT:  The more details, the better, obviously.

19         So if this is due on April 24th, filing something at

20    ten minutes before midnight on Sunday the 23rd is not what I

21    have in mind.  Yes, it would technically be under the wire, but

22    it won't give defense counsel any meaningful opportunity to

23    address it.

24         You understand my point.

25         MS. GOLDBARG:  I do, your Honor.  The only thing that

1    I'm going to ask -- I didn't have a chance to consult with

2    defense counsel -- but since it is going to discuss more

3    specific information about witness testimony -- I am not sure

4    yet if we are going to disclose the witness' name at this time,

5    but in light of some sensitivities the government would ask

6    that we have the court's permission, and hopefully defense

7    counsel requests, to file it under seal at this point in time.

8              THE COURT:  Well, let's talk about that for a minute.

9    If you file it under seal, I can see it.

10             MS. GOLDBARG:  Correct.

11             THE COURT:  Defense counsel could not see it unless

12   you sent it to him.

13             MS. GOLDBARG:  I absolutely would send it to him.

14             THE COURT:  All right.  So if you are going to do

15   that, file a motion under seal, motion to file under seal.

16             MS. GOLDBARG:  Correct.

17             THE COURT:  And in that motion mention that it was

18   discussed in court, the judge approved, Judge Goodman approved,

19   and that you have or will in short order serve defense counsel

20   with a courtesy copy with the court's blessing.

21             MS. GOLDBARG:  Thank you, your Honor.

22             THE COURT:  Or words to that effect.

23             MR. RETURETA:  (Inaudible) also because I think --

24             THE INTERPRETER:  Microphone, please.

25             MR. RETURETA:  I'm sorry.

```
 1              We have alluded to meetings, and the government has
 2    done a wonderful job of describing those meetings.  So I think
 3    the idea is to file it under seal because we can -- there are
 4    little extras that (inaudible).
 5              THE COURT:  Well, safe travels.
 6              MR. RETURETA:  Thank you, your Honor.
 7              THE COURT:  You have a few thousand miles and you have
 8    a few hundred feet.
 9              MS. GOLDBARG:  Exactly, your Honor.
10              THE COURT:  Your trip may actually be more dangerous
11    given the maintenance in this particular building.
12              MS. GOLDBARG:  Yes, your Honor.
13              THE COURT:  All right, folks.  We will be in recess.
14    Take care.  Bye now.
15              MR. RETURETA:  Thank you for the hospitality, your
16    Honor.
17              THE COURT:  You bet.  Take care.
18              (Adjourned)
19
20
21
22
23
24
25
```

C E R T I F I C A T E


        I hereby certify that the foregoing is an accurate

transcription to the best of my ability of the digital audio

recording in the above-entitled matter.


April 14, 2023            s/ Joanne Mancari
                          Joanne Mancari, RPR, CRR, CSR
                          Court Reporter
                          jemancari@gmail.com